*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0051p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                                      *Plaintiff-Appellee,*

                          *v.*                                                 No. 09-6544

SHANNA RAMIREZ,
                                      *Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 09-00046-001—Curtis L. Collier, Chief District Judge.

Decided and Filed: February 14, 2011

Before: MARTIN and McKEAGUE, Circuit Judges; LUDINGTON, District Judge.[*]

_____

**COUNSEL**

_____

**ON BRIEF:** Mary Ellen Coleman, FEDERAL DEFENDER SERVICES OF EASTERN
TENNESSEE, INC., Chattanooga, Tennessee, for Appellant. Gary S. Humble,
ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, Zachary C.
Bolitho, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for
Appellee.

_____

**OPINION**

_____

   THOMAS L. LUDINGTON, District Judge. Appellant Shanna Ramirez
("Ramirez") was indicted on charges of conspiracy to commit social security fraud;
possess a false government identification; and/or harbor illegal aliens in violation of
18 U.S.C. §§ 371 (2006), 1028(a)(6) (2006 & Supp. 2010), 42 U.S.C. § 408(a)(7)(B)

_____

[*]The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of
Michigan, sitting by designation.

1

(2006 & Supp. 2010), and 8 U.S.C. § 1324(a)(1)(A)(iii) (2006) (count one); social security fraud in violation of 42 U.S.C. § 408(a)(7)(B) and 18 U.S.C. § 2 (2006) (count two); possession of a false government document in violation of 18 U.S.C. § 1028(a)(6) (count three); and perjury before the grand jury in violation of 18 U.S.C. § 1623(a) (2006 & Supp. 2010) (counts four and five) in the United States District Court for the Eastern District of Tennessee. Ramirez was acquitted on the possession of a false document charge and convicted of the four remaining charges. Ramirez filed a motion for judgment of acquittal, which was denied by the Honorable Curtis L. Collier. Ramirez was sentenced to fifteen months of imprisonment. Ramirez asserts the district court erred in denying her motion for judgment of acquittal because the government did not present sufficient evidence to substantially corroborate her statements. Because Ramirez's statements were adequately corroborated by independent evidence, we **AFFIRM**.

## I.

This case began when an investigation revealed that Durrett Cheese Sales, Inc. ("Durrett Cheese"), a cheese cutting and wrapping company located in Manchester, Tennessee, hired illegal aliens. Ramirez worked as a quality control manager at Durrett Cheese. Immigration and Customs Enforcement ("ICE") Agent Jeremy Ridenour ("Agent Ridenour") sought to speak with Ramirez about Durrett Cheese's hiring practices. Jill Adkins, a National Labor Relations Board investigator who was looking into an unrelated work stoppage that occurred at Durrett Cheese also wanted to speak with Ramirez. Agent Ridenour and Ms. Adkins agreed to coordinate their investigations. Ms. Adkins called Ramirez to arrange a meeting at a local restaurant to discuss the work stoppage. Ms. Adkins did not inform Ramirez of Agent Ridenour's investigation for fear that Ramirez would not agree to meet with her. Ramirez arrived at the restaurant and discussed the work stoppage while Agent Ridenour waited nearby. Ramirez signed an affidavit providing, among other things, that she was authorized by Durrett Cheese to hire employees, but not to terminate their employment. After Ms.

Adkins completed her discussion with Ramirez, Agent Ridenour approached the table and Ms. Adkins introduced him as an ICE agent.

Agent Ridenour spoke with Ramirez while Ms. Adkins listened and took notes, which she later memorialized in a type-written summary. During the conversation, Ramirez told Agent Ridenour that Durrett Cheese was knowingly hiring illegal aliens. She also acknowledged that many of the employees had submitted false employment-related documents to Durrett Cheese. Ramirez also stated that she helped her former live-in boyfriend, Roberto Flores ("Flores"), get a job at Durrett Cheese using false documents. Flores was later discovered to be an illegal alien.

Ramirez then testified before a grand jury that was investigating Durrett Cheese's employment of illegal aliens. Ramirez was advised of her rights and swore to tell the truth. She informed the grand jury that she had been employed as the quality assurance manager at Durrett Cheese for four years. Because she spoke Spanish and most of the Durrett Cheese prospective hires were non-English-speaking Hispanics, Ramirez translated and completed I-9 Employment Eligibility Verification forms ("I-9 forms") and other employment-related documents for the new employees. In doing so, Ramirez was required to obtain two types of identification from each new employee.

Ramirez testified before a grand jury that she did not know whether Flores had submitted false documents to Durrett Cheese and that she had no reason to believe that any of Durrett Cheese's employees were illegal aliens. The testimony contradicted her earlier statements to Agent Ridenour and Ms. Adkins. Following Ramirez's testimony, the grand jury returned the five-count indictment. The case proceeded to trial.

At Ramirez's trial, the government called Ms. Adkins as its first witness. She testified about the meeting she and Agent Ridenour had with Ramirez, reading from the detailed summary she prepared after that meeting. Ms. Adkins testified that Ramirez stated she was married, and that her husband had returned to Mexico because he had been in the United States illegally. She further explained that Ramirez answered "no" when Agent Ridenour asked if Durrett Cheese knew it was hiring illegal aliens the first

two times, but then answered that Durrett Cheese knew it was hiring illegal aliens who were submitting false documents when asked a third time.

Ms. Adkins also testified that Ramirez stated Flores had previously worked at Durrett Cheese for cash, and that her superior, Brittany Durrett, asked if he wanted to return because the company was shorthanded after many of its employees were arrested on immigration charges. Ramirez stated that Brittany Durrett was initially unwilling to accept Flores' documents because they reflected a different last name than he had used during his prior employment with Durrett Cheese. Ramirez then assisted her boyfriend with completing new documents, and acknowledged knowing that the documents she completed and submitted to Durrett Cheese on Flores' behalf were false.

The government also called David Britain ("Britain"), the grand jury foreman during the Durrett Cheese investigation, as a witness. During the examination, the Assistant United States Attorney read the questions asked of Ramirez during the grand jury session, while Britain read Ramirez's answers. According to the grand jury transcript, Ramirez admitted to completing I-9 forms for Durrett Cheese's new employees. Ramirez also told the grand jury that she did not assist Flores in obtaining a job at Durrett Cheese nor did she know that he had submitted false employment documents, contrary to her earlier statements to the investigators. She also denied knowing that Durrett Cheese hired illegal aliens or that Flores was an illegal alien.

The government introduced eight exhibits (the "Immigration Documents") during Ramirez's trial, which consisted of: copies of the I-9 forms, social security cards, permanent resident cards, W-4 forms, and other employment related documents for seven Durrett Cheese employees. The employees were Mercedez Gomez, Dalila Contreras, Ma Remedios Cano, Teresa Rosales, Sarai Contreras, Amaro Cirilo, and Roberto Flores. Each of the admitted I-9 forms had Ramirez's signature under the following statement: "I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct." App'x Vol. II at 45. The government also introduced a stipulation with Ramirez. The stipulation provided that the Immigration Documents were fraudulent, and

that the employees who submitted the documents were illegal aliens. The United States rested its case, and Ramirez moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(a).

Ramirez argued that the government did not offer independent evidence that she knowingly engaged in the conduct charged in the indictment, and that the government's case consisted only of Ramirez's uncorroborated statements. The government responded that Ramirez previously admitted to knowingly engaging in the conduct charged in the indictment, and that Ramirez's admissions about helping illegal aliens gain employment at Durrett Cheese were independently corroborated by the Immigration Documents and the stipulation. The court took Ramirez's motion under advisement and Ramirez proceeded to present her case.

Ramirez's first witness was Donna Fullen, a previous employee of Durrett Cheese, who testified that one of Ramirez's responsibilities was to review employment applications and make contact with potential new employees because most of Durrett Cheese's prospective employees were Spanish-speaking. Ms. Fullen also testified that Ron Girts, the plant manager, and Brittany Durrett, the owner's daughter, made the final hiring decisions. Ms. Fullen did not have any knowledge of events that occurred since she left the company in 2004.

Ramirez next called Ron Girts, who confirmed that Ramirez was involved in the hiring process because she spoke Spanish, and Durrett Cheese mainly employed people who could not speak English. Ramirez's responsibilities included verifying that the applications were properly completed, and she would make copies of the necessary papers. Mr. Girts also testified that Ramirez conducted interviews of the applicants and would make hiring recommendations to Brittany Durrett. Mr. Girts sometimes signed the I-9 forms under the employer section but relied on others to properly complete the documents and collect the required information from new employees.

Ramirez also testified in her own defense. Ramirez explained her employment responsibilities at Durrett Cheese, among other things. Ramirez testified that although she is Native American, she learned Spanish because her mother married a Hispanic man

when Ramirez was young. Ramirez's husband also spoke Spanish. Ramirez's husband applied for naturalization after their marriage, but left the United States for a year and ten months as a penalty for being in the United States illegally.

Ramirez began working at Durrett Cheese in 2000 and because she spoke Spanish fluently she was asked to assist with the hiring process after interpreters were fired due to decreased business. At that time, about ninety percent of the employees were Hispanic. Ramirez explained that when additional people needed to be hired, Ron Girts or Brittany Durrett made the hiring decisions.[1] Paperwork for new employees included an application, a new hire form, a W-4, and an I-9 form. The application was typically completed by the prospective employee, the new hire form was completed by Ramirez, and Section 1 of the I-9 form would be completed by Ramirez. Ramirez would then copy the information from the individuals application, resident card, and social security card to the I-9 form, and upon completion would submit the forms to Brittany Durrett. Ramirez testified that she believed the certification she signed was limited to certifying that she accurately interpreted the information she was provided.

Ramirez also recounted her telephone conversation and subsequent meeting with Ms. Adkins concerning the workers' strike. Her account of the telephone call and the meeting was similar to Ms. Adkins' account. Ramirez testified that she met Flores after she dialed a wrong number and he subsequently came to visit her in February 2007, and then returned in June 2007 when they began living together. The couple lived together thereafter for approximately one month. During that time, Flores would visit Ramirez at work and was asked by Brittany Durrett if he wanted a job. Flores did not complete any work-related forms because he was paid in cash. Flores left the job at some point, returning in September 2007 and Brittany Durrett again asked him if he wanted a job. Ramirez completed the employment forms based on Flores' documentation, but

---

[1]This contradicts Ramirez's prior statement that she had the authority to hire new employees but did not have the authority to fire employees. *See also* App'x Vol. II at 4, 39 ("My job was quality supervisor, but I ran the whole place."). Ramirez did admit on cross examination that she said she could hire, but meant that she could give a recommendation to hire and Brittany Durrett would approve it. She also testified that Brittany Durrett, Ron Girts, or Greg Durrett, the company owner, could all veto her recommendations.

confusion arose with her supervisors because Flores used the hyphenated names of both his parents for his surname, and that did not match the name previously provided. Ramirez advised that the last names were somehow switched, although Flores' documents only reflect the use of a single last name.

Ramirez also testified that during the meeting with Agent Ridenour, she was asked questions rapidly and Agent Ridenour would ask another question before Ramirez could completely answer the prior one. She also stated that Agent Ridenour had confused the chronology of Ramirez's relationships with Ramone, a boyfriend she knew before her marriage who was allegedly an undocumented person, her marriage to her husband, and her cohabitation with Flores. Agent Ridenour allegedly told Ramirez that he knew more than Ramirez thought he knew, and if she did not answer questions truthfully he would take her to jail. Ramirez testified that she became confused during the questioning and eventually told Agent Ridenour that she knew employees were undocumented after he asked a third time.

Ramirez also sought to clarify her grand jury statements that she did not know Flores was an illegal alien "at that time." She stated that she discovered he was "illegal" in December 2007 after he left her house the second time they lived together. She also stated that, at the time he was hired at Durrett Cheese, she was unaware that he or the other individuals were "illegal."

## II.

"This court reviews de novo a denial of a motion for judgment of acquittal, but affirms the decision 'if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt.' " *United States v. Solorio*, 337 F.3d 580, 588 (6th Cir. 2003) (citing *United States v. Harrod*, 168 F.3d 887, 889-90 (6th Cir. 1999)); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (when considering sufficiency of evidence to sustain a conviction on direct appeal, the "relevant question" is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). Because the issue is one of legal sufficiency, the court "neither independently weighs the

evidence, nor judges the credibility of witnesses who testified at trial." *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999). An appellate court cannot substitute its judgment for that of the jury. *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). "[C]ircumstantial evidence alone can sustain a guilty verdict and . . . [such] evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984). This standard is a great obstacle to overcome, *United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007), and presents the appellant in a criminal case with a "very heavy burden," *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007).

## III.

Ramirez argues that the district court erred in denying her motion for judgment of acquittal because the government did not substantially corroborate her extra-judicial statements, resulting in her conviction being based on these statements alone.

## A.

A defendant cannot be convicted based solely on her uncorroborated statements or confessions. *Smith v. United States*, 348 U.S. 147, 153-54 (1954). The purpose of this rule is to avoid errors in convictions based upon untrue confessions and to promote sound law enforcement by requiring police investigations to extend their efforts beyond the words of the accused. *Wong Sun v. United States*, 371 U.S. 471, 489 (1963); *Smith*, 348 U.S. at 153. This rule also ensures that an appropriate investigation is done prior to prosecution. *See Smith*, 348 U.S. at 152.

The corroboration rule "prevents errors in convictions based upon untrue confessions alone." *United States v. Davis*, 459 F.2d 167, 170 (6th Cir. 1972). Though a statement may not be involuntary within the meaning of the exclusionary rule, its reliability may still be suspect if it is extracted from a person under the pressure of police investigation because his or her words may reflect the strain and confusion of the situation, rather than a clear reflection of the past. *Smith*, 348 U.S. at 153. The government may provide corroboration by introducing substantial evidence apart from

the defendant's admissions.  *Id.* at 157.  "An out-of-court admission is adequately corroborated if the corroborating evidence 'supports the essential facts admitted sufficiently to justify a jury inference of their truth.' " *United States v. Pennell*, 737 F.2d 521, 527 (6th Cir. 1984) (quoting *Opper v. United States*, 348 U.S. 84, 92-93 (1954)). Corroborative evidence need not establish each element of the offense. *Opper*, 348 U.S. at 93.  In other words, the "corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that defendant is guilty." *Davis*, 459 F.2d at 171 (quoting *Smith*, 348 U.S. at 156).

The court serves as a gatekeeper with regard to whether an admission by the defendant has been sufficiently corroborated to ensure its reliability. *United States v. Bryce*, 208 F.3d 346, 355 (2d Cir. 1999).  "[O]ne available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused." *Smith*, 348 U.S. at 156.  A confession is adequately corroborated where "[e]xtrinsic proof . . . fortifies the truth of the confession, without independently establishing the crime charged." *United States v. Ybarra*, 70 F.3d 362, 365 (5th Cir. 1995).  So long as portions of the defendant's statement are corroborated by "substantial independent evidence" that "tend[s] to establish the trustworthiness of the statement," then the elements of the crime may be established by the defendant's statements. *Opper*, 348 U.S. at 93; *see also United States v. Brown*, No. 09-5431, 2010 WL 3304624, at *5 (6th Cir. Aug. 24, 2010) (finding that "independent corroboration of one part of the statement may corroborate the entire statement").

When determining whether the defendant's statements were corroborated and whether the evidence as a whole was sufficient, a court must view the evidence in the light most favorable to the United States. *See Pennell*, 737 F.2d at 537. The court must refrain from "weigh[ing] the evidence, mak[ing] credibility determinations, or substitut[ing] [its] judgment for the jury's verdict." *United States v. Crossley*, 224 F.3d 847, 855 (6th Cir. 2000). A court will not lightly disturb a jury's verdict based on the corroboration rule because the "rule does not infringe on the province of the primary

finder of facts." *Smith*, 348 U.S. at 153. Furthermore, an aggressive corroboration requirement could result in "the restrictions it imposes surpass[ing] the dangers which gave rise to them." *Id.*

**B.**

Ramirez contends that the government has not offered independent evidence to corroborate her admissions, and has only introduced statements and testimony of an investigator regarding Ramirez's statements and Ramirez's grand jury testimony. The government disputes Ramirez's assertion. Specifically, the government emphasizes that eight exhibits consisting of I-9 forms and other employment-related documents which contain false information were admitted into evidence. Ramirez acknowledged that she completed and signed the I-9 forms, which also serve to corroborate the offenses. The government also contends that the stipulation makes clear that the former Durrett Cheese employees whose fraudulent documents were admitted into evidence were illegal aliens, and that the documents they submitted to Durrett Cheese with Ramirez's assistance were false.

The government posits that it is not required to corroborate every fact contained in Ramirez's statements to the investigators, but is only required to corroborate some of the important facts. *Dalhouse*, 534 F.3d at 806. The government contends that Ramirez's statement that Durrett Cheese knowingly hired illegal aliens was corroborated by the stipulation, which provided that all of the employees whose identification documents were admitted into evidence were illegal aliens. Furthermore, the stipulation and Immigration Documents provide adequate corroboration for Ramirez's statement to the investigators that Durrett Cheese knew its employees were submitting false documents as well as Ramirez's statement that she knew Flores had submitted false documents to Durrett Cheese. Finally, the employment documents and stipulation also corroborate Ramirez's statement that she recognized some of the identification documents submitted by employees were "poor fakes."

**1.**

To establish a conspiracy, the government must prove that the defendant knowingly and voluntarily joined the conspiracy, and that a member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.  *See* Sixth Circuit Pattern Jury Instruction 3.01A.   The substantive offense of falsely representing a social security number in violation of 42 U.S.C. § 408(a)(7)(B) requires proof of (1) a false representation of a social security number, (2) with the intent to deceive, (3) for any purpose. *United States v. Means*, 133 F.3d 444, 447 (6th Cir. 1998).

Ramirez contends that the government did not offer any evidence of an agreement to commit a crime, and the fact the Ramirez read a form in Spanish that was written in English and recorded the Spanish responses in English as a translator does not imply an agreement to commit a crime. According to Ramirez, to do so would mean that every time a translator repeated an untrue response by an individual sworn to tell the truth, the translator would commit perjury. Ramirez alleges that a translator would commit perjury only when she incorrectly repeats the response, since the translator swears to telling the truth as to what was said in the other language.  Ramirez argues that the I-9 form translator certification, *supra* Part I, does not address the truth of the information provided, but does address the accuracy with which it was translated from one language to another. *See* Steven M. Kahaner, *Legal Translation Today: Toward a Healthier State of Reality*, 19-SPG Int'l L. Practicum 80, 81 (2006) (stating that the translator must deconstruct and decode the source text and then reconstruct its meaning in the target text in the context of legal document translation so that lawyers can comprehend, analyze, and react to foreign-language documents). Furthermore, Ramirez asserts that the false statement warning, "I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form," was meant for and signed by the employee.

The government, however, asserts that Ramirez's argument misses the mark because it is "not necessary for the government to produce evidence of an actual

agreement, or Defendant's assent to the agreement" in order to establish a conspiracy. *United States v. Zacaria-Barajas*, 80 F. App'x 990, 994 (6th Cir. 2003). Establishing a conspiracy only requires evidence of a mutual understanding or tacit agreement, which "may be inferred from circumstantial evidence." *United States v. Blackwell*, 459 F.3d 739, 760 (6th Cir. 2006). Circumstantial evidence of a tacit agreement or mutual understanding was presented in this case, according to the government, with respect to Flores. Specifically, Ramirez completed Flores' employment documents in their entirety, signed them for Flores, and told the investigators that she knew at that time that Flores was an illegal alien. Ramirez also stipulated to Flores being an illegal alien. Brittany Durrett's refusal to accept Flores' employment paperwork because his last name was different than in his prior papers was further notice that Flores was an illegal alien.[2] The government contends that based on these facts, along with Ramirez admitting at trial that some of the submitted documents were "poor fakes," a rational juror could have reasonably concluded that Ramirez and Flores tacitly agreed to falsify the documents submitted to Durrett Cheese.

The government highlights that the I-9 translator certification, as opposed to the false statement warning meant for the employee, provides that the translator is asserting that the *information* is correct, not that the *translation* is accurate, to prohibit translators from knowingly placing false information on the form in order to help illegal aliens secure employment. This question does not appear to have been addressed in any reported decisions and we decline to decide at this time whether a translator may be held liable for false information that winds up on an I-9 form. We need not reach this question because the circumstances surrounding Ramirez's preparation of Flores' I-9 application satisfy all elements of the conspiracy to falsely represent a social security number charge. We therefore decline to determine whether Ramirez violated 42 U.S.C. § 408(a)(7)(B) merely by signing the translator certification on the I-9 applications that she completed for other employees.

---

[2]Ramirez, however, contradicts this in her earlier statement that Flores had no employment documents during his first period of employment because he was paid in cash.

In addition, the government need not corroborate Ramirez's in-court admission that she knew some of the employee's documents to be "poor fakes," because the corroboration rule only applies to post-offense, extrajudicial statements. *Opper*, 348 U.S. at 91. As to Ramirez's knowledge of Flores being an illegal immigrant and thus ineligible for employment, a reasonable jury could have inferred such knowledge based on Ramirez's intimate relationship with Flores, as well as her willingness to assist others in obtaining employment using the documents she described as "poor fakes." Ramirez was further put on notice of Flores' employment eligibility problems when his application for employment was rejected by Brittany Durrett for containing information inconsistent with Flores' previous application. After this, Ramirez assisted Flores in submitting new information matching his prior application. These events, taken either separately or together, provide substantial, independent evidence from which a juror could have reasonably concluded that Ramirez's extrajudicial statements were true.

As to whether Ramirez agreed to commit a crime, this too could have been a reasonable conclusion by the jury based on Ramirez's knowledge that at least some of the documents provided were "poor fakes," and her intentional certification of employment eligibility using these documents. Further corroboration of this conclusion is unnecessary because, as noted above, Ramirez's statement that she knew the documents to be "poor fakes" but still certified the applications was an in-court admission.

**2.**

Ramirez's conviction under an aiding and abetting theory for falsely representing a social security number requires proof of (1) an act by the defendant that contributes to the execution of a crime, and (2) the intent to aid in the crime's commission. *United States v. Penney*, 576 F.3d 297, 316 (6th Cir. 2009). Ramirez similarly asserts that she only placed the social security numbers she was provided on forms in her capacity as a translator. Upon noticing that a particular social security card looked incorrect, Ramirez notified Brittany Durrett. In doing so, Ramirez contends that she performed her job as a translator but also identified documents that were potentially fraudulent to her superior,

which she argues is not the conduct of a person attempting to assist in social security fraud to obtain employment. To this end, Ramirez contends that the government offered no corroboration for the assertion that Ramirez knowingly aided and abetted others in the false use of social security numbers.

The government asserts that the evidence established that Ramirez contributed to the commission of falsely representing a social security number by completing and certifying I-9 forms and other employment-related documents for multiple illegal aliens who were hired by Durrett Cheese.  In particular, Ramirez admitted recognizing that some of the documents provided to her by prospective employees were false yet still accepted the documents, signed the I-9 forms, and recommended that the individuals be hired.  After learning that the documents prepared by Flores had been rejected by Brittany Durrett, Ramirez also prepared new documents for Flores.  These new employment documents prepared by Ramirez were stipulated to be false by both parties. As a result, the government asserts that the jury could have reasonably concluded that Ramirez intended to help Flores gain employment at Durrett Cheese by submitting documents that contained a false social security number.  Her intent was further established by repeatedly completing I-9 forms based on fraudulent documents. This demonstrates that it was not an isolated incident with Flores that could be explained by inadvertence or accident.  It follows that a rational juror could have concluded that this pattern of conduct was indicative of Ramirez's intent, and the government contends that there was sufficient evidence to support the jury's verdict.

Because Ramirez's in-court statements do not require corroboration, and the evidence provided regarding Ramirez's intimate relationship with Flores as well as her willingness to certify applications for employees despite being aware that at least some of the documents were fraudulent, Ramirez has not met her burden of demonstrating that a rational juror could not have reasonably concluded that Ramirez intended to aid in falsely representing a social security number.  Accordingly, the jury's verdict on this count will not be disturbed.

**3.**

A conviction under § 1623(a) requires proof that the defendant (1) knowingly made, (2) a materially false declaration, (3) under oath, and (4) before a federal grand jury. *United States v. Safa*, 484 F.3d 818, 821 (6th Cir. 2007). Under the statute, it is not necessary that "such proof be made by any particular number of witnesses or by documentary or other type of evidence." 18 U.S.C. § 1623(a). Ramirez alleges that the government has not provided any evidence, other than her own statements, that she had actual knowledge at the time Flores lived with her and worked at Durrett Cheese that he had used fraudulent documents or that he was illegally in the country. Ramirez claims the government did not present any evidence to demonstrate how she knew that Flores used fraudulent documents at the time he was employed with Durrett Cheese: no one testified that Ramirez had made such an admission, no one demonstrated that the documents were obviously fraudulent, and there was no evidence the Ramirez had created or knew the applicant who had created the fraudulent documents.

Additionally, Ramirez contends that the government offered nothing more than the confusing testimony of several witnesses about differences between Ramirez's statements to the grand jury and her actual knowledge at that time, and additional testimony about uncertainties regarding Flores' last name. Ramirez instead claims that it is likely that she learned of Durrett Cheese's illegal immigrant hiring practices and certain individual's illegal immigrant status because of the investigation. There was no additional evidence demonstrating that the documents themselves were fraudulent, or that Ramirez knew the documents to be fraudulent. Ramirez emphasizes there was no testimony or evidence that Flores entered the United States illegally, how he came to the United States, or that he had not obtained proper permission to be in the country. Ramirez asserts she may have learned this information at a later point in time, such as during her meeting with Agent Ridenour, but there is no corroborating evidence that she knew the information while cohabiting with Flores.

The government, however, maintains that Ramirez's responses that she didn't know if Flores used fraudulent documents and that she didn't know Flores was an illegal

alien were indeed perjury. The government correctly explains that Ramirez is only challenging the knowledge element under § 1623(a). In proving that Ramirez knew that Flores was an illegal alien and that the documents he submitted to Durrett Cheese were fraudulent, the government is not required to prove her knowledge that her statements were false through "direct evidence" because in most cases, "direct evidence of state of mind is impossible to produce." *United States v. Bobbitt*, No. 92-6445, 1994 WL 18019, at *3 (6th Cir. Jan. 21, 1994). Circumstantial evidence, however, is "useful and competent" for the purpose of establishing that a defendant knew the statements made to a grand jury were false. *Id.*

The government asserts that there was sufficient evidence from which a rational juror could have convicted Ramirez of perjury before the grand jury. More specifically, a rational juror could have concluded that Ramirez knew that Flores, her live-in boyfriend at that time, was an illegal alien and that he submitted false documents, which Ramirez helped prepare, to Durrett Cheese to secure a job. Furthermore, the government contends that such a conclusion is especially reasonable in this circumstance because of Ramirez's familiarity with the immigration process because her husband was an illegal alien who had returned to Mexico. As a result, the government argues that Ramirez's claim of being oblivious to Flores' status as an illegal alien is contradicted by circumstantial evidence and common sense. Ramirez's argument that there was no proof she knew Flores had submitted false documents to Durrett Cheese thus suffers from the same flaw according to the government. Because of the significant circumstantial evidence that Ramirez knew Flores was an illegal alien, it logically follows that there was sufficient evidence from which a rational juror could have concluded that she knew the information she completed on his employment-related documents was false.

As discussed above, the evidence offered by the government regarding Ramirez's conviction for conspiracy and falsely representing a social security number support a reasonable jury finding that Ramirez knew Flores was an illegal immigrant and that he was using false documents at the time he was hired. The Immigration Documents offered at trial as well as the stipulation provide substantial and independent evidence that the offenses were committed. In addition, the evidence demonstrating Ramirez's

knowledge that submitted documents were "poor fakes," as well as her intimate relationship with Flores, provide adequate corroboration for Ramirez's extra-judicial admissions.

**IV.**

For the reasons set forth above, we **AFFIRM** the decision of the district court.