**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0075n.06

**No. 14-5668**

**UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 26, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| DAVID GRIGSBY, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:    SUHRHEINRICH and GRIFFIN, Circuit Judges; LEITMAN, District Judge[*].

**SUHRHEINRICH, Circuit Judge.**

Defendant David Grigsby was convicted of three counts of perjury in violation of 18 U.S.C. § 1623, for lying to the grand jury. He appeals those convictions. We AFFIRM.

**I.**

Eastman Chemical Company of Kingsport, Tennessee, uses large quantities of steam coal (a grade of coal between bituminous and anthracite). Eastman pays for that coal based in part on the coal's British Thermal Unit (BTU) rate, which is a common way to price coal. Eastman pays extra for higher quality coal, or coal with a higher BTU. Eastman hired a third-party coal

---

[*] The Honorable Matthew J. Leitman, United States District Judge for the Eastern District of Michigan, sitting by designation.

inspection and testing company, SGS North America, Inc. (SGS) to test the coal it purchased. SGS collected the coal samples as they were loaded into rail cars for shipping to Eastman. SGS would then analyze the coal to assess the BTU rate.

Hills Fuels, owned by Gus Hill, and True Energy Services, Inc., owned by Defendant's brother Darrell Grigsby, sold coal to Eastman. Defendant David Grigsby was the foreman for Hills Fuels. Defendant loaded coal into railcars with a front-end loader from both suppliers.

In August 2012, a federal grand jury in Greeneville, Tennessee, began investigating the two suppliers because it was suspected they were bribing an employee of SGS to submit nonrepresentative samples of coal for testing, i.e. coal samples with higher levels of BTU than the coal Eastman actually received.

Defendant appeared before the grand jury on August 14, 2012. He testified that he was the foreman for Hills Fuels and was responsible for filling rail cars with coal for Eastman, using a front-end loader. He stated that SGS and Standard Labs sampled and tested coal at Hills Fuels, and that it was typically collected by SGS employee Anthony Wells. While under oath, Defendant was asked how Wells collected samples:

Q.    When Wells would come and get a sample, is he just going to the pile that you're scooping out of?

A.    Right.

Q.    And if you're mixing up piles, how does he know what to put in the bag?

A.    That would be what I would be, you know, picking up out of the pile.

Q.    . . . If you've got maybe two piles of coal there and you're mixing it up like you said, maybe five buckets out of one pile, five buckets out of the other pile—

A.    Yeah.

Q. --and when the inspector comes, is he taking the coal out of the car that you just loaded?

A. He's actually—

Q. Is that what gets sampled or is he just going over to the pile that you've been digging out of?

A. He's going to the pile I'm digging out of.

Q. So how does he know how much you dug out of one pile and how much you dug out of the other pile?

A. Usually watching me I guess.

Q. Okay. He's going to watch you 'til you've loaded a car and then see how many scoops you took out of one pile—

A. Right.

Defendant was then asked:

Q. --and how many scoops you took out of another? Would you ever tell an inspector, say, "Well you need to go take so many shovelfuls out of this pile—"

A. No.

Q. "—and so many shovelfuls out of this other pile"?

A. No. I don't tell 'em how to do their job.

This answer formed the basis of Count I of the indictment.

Later, Defendant was asked whether he had ever instructed an SGS or Standard Lab employee how to take samples.

Q. But you've never given an SGS employee or a Standard Lab employee instructions about how to take their sample?

A. No, I've never told 'em how to take their samples.

This answer formed the basis of Count II of the indictment.

Defendant was informed that the grand jury was investigating the nonrepresentative coal samples submitted for testing and again asked if he had ever told an inspector how to collect a sample.

Q.    And you didn't ever tell an inspect[or] about how--

A.    No.

Q.    -- to get together a sample?

A.    No.  I mean, hell, it's his job.  I'm supposed to tell a man how to do his job?

This answer formed the basis of Count III of the indictment.

During the grand jury proceeding Defendant stated, "You got any questions I'll answer 'em, I got my right hand raised.  I'm not lying, I got nothing to lie about." and when advised that he could recant any false testimony without penalty before the grand jury took action, Defendant said, "I've . . . told no lie."

As noted, Defendant was indicted on three counts of knowingly making false declarations to a grand jury, in violation of 18 U.S.C. § 1623.  He moved to dismiss the indictment on the grounds that the questions posed to him before the grand jury were vague and so "fundamentally ambiguous" that he could not have intentionally provided false answers to those questions.  The government filed a response.  The magistrate judge found that the "[t]he questions are not ambiguous when read in context; they are not 'compound questions,' and neither was the grammar nor the syntax of the questions such that a person of even limited intelligence would have been unable to understand the clear import of the questions."  The magistrate judge

therefore recommended that the motion be denied. Defendant did not file any objections to the report, and the district court adopted it in its entirety.

Defendant's grand jury testimony was presented at trial. Wells, a coal sampler for SGS, testified. He stated that the samples should represent the coal being tested. Wells explained that for coal being loaded into rail cars, a representative sample could be obtained by a mechanical sampling system or manually with a shovel and a bag. His job was to observe the coal being loaded, collect representative samples of coal for analysis, transport samples to the lab, and prepare samples for analysis (other SGS employees then analyzed the samples for BTUS, among other things). Wells stated that he collected samples from Hills Fuels on behalf of Eastman from 2010 to 2012. Wells identified Gus Hill as the owner of Hills Fuels and Defendant as the foreman. Wells testified that Gus Hill bribed him to collect samples that did not mirror the coal Eastman contracted for, and that Defendant told him what coal to include or exclude in each sample.

Wells recorded several encounters with Defendant, which were played at trial. On February 7, 2012, Defendant directed Wells "to put a little bit of stoker or something to get the BTU up;" "don't get none of that," which meant not to collect a sample from lower quality coal that Defendant was loading in the rail cars; and "we might have to add us two or three shovels full of stoker or something to get the BTU up or something." Stoker is a higher quality coal that would increase the BTU of a sample. On February 9, 2012, Defendant instructed Wells as to how many shovelfuls of stoker to place in the sample bag. At trial, Wells explained that Defendant was instructing him not to collect any samples from the lower quality coal being loaded onto the rail cars for Eastman.

The grand jury foreperson explained that the grand jury was investigating whether Eastman coal was paying for high quality coal but receiving low quality coal because the testing company was being bribed, in violation of the wire fraud statute. She testified that it was important to the grand jury to know how the samples were being collecting by the SGS employees because "they were supposed to be random samples," but were "in effect, doctored samples."

Defendant called FBI Special Agent Drew Scown to testify about the alleged scheme by Hills Fuels and other coal brokers to defraud Eastman. Scown testified that Eastman stopped buying coal from Hills Fuels in October 2010 because it was concerned about coal quality and that Defendant's brother Darrell formed True Entergy and began selling coal to Eastman in March 2011. On January 26, 2012, Scown interviewed Wells, who agreed to cooperate and assist in the investigation. Scown interviewed Defendant in May 2012; Defendant denied any involvement in the scheme. Scown testified before the grand jury in August 2012 about the fraud scheme. He told the grand jury that the evidence indicated that Defendant had instructed Wells how to obtain the samples, although Defendant denied that fact.

Defendant was convicted as charged and moved without success for a judgment of acquittal or new trial. He was sentenced to 12 months and 1 day of imprisonment, followed by three years of supervised release, and a $4,000 fine. This appeal followed.

**II.**

**A.**

On appeal Defendant claims that "the government failed to meet its burden to prove that his statements to the grand jury, if proven false, were material to the grand jury's investigation." Appellant's Br. at 11. We review the denial of a Rule 29 motion de novo, but affirm the conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See United States v. Ramirez*, 635 F.3d 249, 255 (6th Cir. 2011). The issue is legal sufficiency of the evidence; we cannot substitute our judgment for the jury's. *Ramirez*, 635 F.3d at 255-56. This standard imposes a "very heavy burden" on the defendant-appellant. *Id.* at 256.

A perjury conviction under 18 U.S.C. § 1623 requires proof that the defendant (1) knowingly made, (2) a materially false declaration, (3) under oath, and (4) before the grand jury. *Id*. at 260; *United States v. Lee*, 359 F.3d 412, 416 (6th Cir. 2004). The materiality of the false declaration is a jury question. *United States v. Safa*, 484 F.3d 818, 821 (6th Cir. 2007). A statement is material if it has the natural tendency to influence, or was capable of influencing, the decision of the decision-making body. *Lee*, 359 F.3d at 416. The government does not need to prove that the perjured testimony actually influenced the grand jury. *Id*. Rather, "a false declaration satisfies the materiality requirement if a truthful statement might have assisted or influenced the grand jury in its investigation." *Id*. at 417 (internal quotation marks and citation omitted).

Defendant contends that his grand jury testimony was not material because Scown testified before the grand jury before he did and Scown made the grand jury aware of the conversations between Wells and Defendant. (Notably, Defendant does not maintain that the statements themselves were not false.) Further, the grand jury foreperson testified that based on Scown's testimony, she already believed that Defendant had instructed Wells on how to collect samples. Thus, according to Defendant, his testimony could not have impeded, influenced, or dissuaded the grand jury from pursuing its investigation. *See United States v. Richardson*, 596 F.2d 157, 165 (6th Cir. 1979). Moreover, the jury foreperson was the government's only witness to offer proof of materiality, and she did not offer any testimony to show that Defendant's statements had any effect on the grand jury. And, since the day of Defendant's testimony was the foreperson's last day, she could not know if or how Defendant's testimony affected the grand jury's investigation of the fraud scheme.

Notwithstanding, the materiality of a false statement is tested by asking whether a truthful statement might have helped the grand jury. *See Lee*, 359 F.3d at 417. Thus, for purposes of 18 U.S.C. § 1623, it is "irrelevant" whether the false statement failed to lead the grand jury "astray." *Id.* (citing *United States v. Swift*, 809 F.3d 320, 324 (6th Cir. 2007)).

Viewing the facts in the light most favorable to the prosecution, it is clear that there was sufficient evidence from which a rational reasonable jury could conclude that Defendant's false statements were material. Put it this way—if Defendant had testified that he instructed Wells how to collect the nonrepresentative samples—the grand jury would likely have asked him why, and who, if anyone, told him to direct Wells. These questions would have been relevant to the grand jury's investigation of the fraud scheme to supply doctored samples to the testing company. Thus, this exercise reveals that Defendant's false testimony was material.

In sum, Defendant has not met his "very heavy burden" of demonstrating that the evidence was insufficient to support his convictions. *See Ramirez*, 635 F.3d at 255-56.

**B.**

Defendant also argues that the district court should have granted his motion to dismiss the indictment because it failed to set forth the elements of perjury. More specifically, Defendant attacks all three counts as ambiguous and vague. A prosecution under a perjury statute cannot be based on an ambiguous question where the response may be literally and factually correct. *See United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999) (citations omitted). However, because Defendant failed to object to the report and recommendation, he has waived this claim. *See United States v. Campbell*, 261 F.3d 628, 631-32 (6th Cir. 2001).

**III.**

For the foregoing reasons, Defendant's convictions are **AFFIRMED.**