RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0164p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee*,

      *v.*

                             No. 12-3238

AKEEM STAFFORD,

                *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:11-cr-44-1—Dan A. Polster, District Judge.

Argued: January 17, 2013

Decided and Filed:  June 11, 2013

Before:  BOGGS and WHITE, Circuit Judges; and McCALLA, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Amy B. Cleary, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant.  Daniel R. Hurley, UNITED STATES ATTORNEY'S OFFICE, Ann Arbor, Michigan, for Appellee. **ON BRIEF:** Amy B. Cleary, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant.  Daniel R. Hurley, UNITED STATES ATTORNEY'S OFFICE, Ann Arbor, Michigan, for Appellee.

_____

### OPINION

_____

JON P. McCALLA, District Judge.  Akeem Stafford appeals his conviction and sentence for one count of violating 18 U.S.C. § 922(g)(1), felon in possession of a firearm and ammunition.  The district court sentenced Stafford to 262 months of imprisonment (21 years and 10 months) and five years of supervised release, after

---

[*]The Honorable Jon Phipps McCalla, Chief United States District Judge for the Western District of Tennessee, sitting by designation.

enhancing his guideline calculation based on (1) Stafford's armed- career-criminal status; (2) the fact that the firearm was stolen; (3) Stafford's possessing a firearm in relation to a felony offense; and (4) Stafford's reckless endangerment during flight from law enforcement.

Stafford argues the conviction was in error because the evidence does not support the verdict and because the district court improperly admitted gunshot-residue evidence and related expert testimony. Stafford also argues the sentence was in error because the district court improperly applied the Armed Career Criminal Act enhancement, relied on impermissible documents—a state-court Bill of Particulars—to determine that his previous conviction was a "violent felony" under the Armed Career Criminal Act, and imposed a procedurally unreasonable sentence. Additionally, Stafford claims the "residual clause" of the Armed Career Criminal Act is unconstitutionally vague.

The Government concedes that the district court erred in considering the state-court Bill of Particulars as part of its determination that Stafford's previous conviction for "aggravated riot" was a "violent felony" under the Armed Career Criminal Act.

For the reasons set forth below, Stafford's conviction is AFFIRMED. The evidence supports the jury's verdict and the district court did not err in allowing gunshot-residue evidence or the related expert testimony. Stafford's sentence is also AFFIRMED. The district court properly applied the enhancement under the Armed Career Criminal Act and the enhancements under the Sentencing Guidelines; the sentence was procedurally reasonable; and the "residual clause" of the Armed Career Criminal Act is not void for vagueness.

## I. BACKGROUND

At approximately 2:00 a.m. on November 21, 2010, Defendant-Appellant Akeem Stafford ("Stafford") was standing outside Uncle Vic's nightclub on Kerstetter Way in Elyria, Ohio. As City of Elyria Police Officer Joe Figula ("Figula") was patrolling the area around Uncle Vic's on Broad Street in his car, he heard a gunshot. After stopping near the intersection of Kerstetter Way and Broad Street, Figula observed a man,

wearing jeans and a dark zip-up sweatshirt with white lettering on the back, fire two more gunshots. One of these rounds was later found to have struck the passenger window of a bystander's automobile. The shooter was later identified as Akeem Stafford. Figula reported the shooting over his police radio, mobilizing the Elyria Police Department to the area. Stafford looked up the hill at Kerstetter Way and saw Figula's police car, and Figula observed Stafford run down an adjacent alley, Tremont Street. Figula then turned his car around and proceeded to a nearby McDonald's parking lot where the alley ended and where he expected Stafford to emerge.

Stafford emerged from the alley and cut across the McDonald's parking lot, running past Figula's car and into traffic. Figula observed that the suspect running from the alley was wearing the same clothing as the shooter. As Figula attempted to follow Stafford in his car, Stafford looked back and made visual contact with Figula by looking "right at" him. Figula lost sight of Stafford when Stafford ran across the street and under an overhang near the First Merit Bank building.

Figula then drove to the east side of the First Merit Bank building, looking for Stafford to emerge, but instead found a black SUV with passengers who advised Figula they thought someone was shooting at them. Figula then told other officers in pursuit of the suspect where he had last seen Stafford and returned to that location. Now on foot, Figula searched the area around the bank building and found Stafford lying face down, wedged between the back of the building and a large green exterior power unit.[1] Figula alerted the other officers that had arrived on the scene and proceeded toward Stafford. With his gun drawn, Figula ordered Stafford to show his hands and to come out from his hiding place. When Stafford failed to comply, Figula jumped on Stafford's back, holding him down to prevent him from escaping or reaching for a firearm. Once secured, the other officers helped Figula remove Stafford, now struggling with the officers, from the area.

---

[1]In his testimony, Figula erroneously described the building's exterior power unit as a "large air-conditioning power unit." The Presentence Investigation Report, however, determined that this unit was a "large green exterior power box."

After removing Stafford from between the wall and the power unit, the officers noted that Stafford was not carrying a firearm. Figula organized a search for the weapon, retracing Stafford's movements backwards from behind First Merit Bank to the Tremont Street alley near Uncle Vic's nightclub. After the initial walkthrough yielded no results, Figula continued down the alley back towards Kerstetter Way and Uncle Vic's nightclub. Figula found two spent .45-caliber shell casings on the ground near the entrance of the alley from Kerstetter Way. On the arrival of the evidence technicians, a third shell casing was recovered and the search for the missing firearm resumed. The firearm, a .45-caliber semiautomatic handgun, was eventually recovered from under a staircase in the Tremont Street alley behind Moss' Steakhouse. Figula noted that the gun's magazine was partially ejected and a live round was visible in its barrel. A total of six live rounds of ammunition were recovered from the gun. Figula also noted that the gun was scuffed, indicating the gun may have been thrown and struck the cinder-block wall adjacent to where the gun was found.

Subsequent ballistics tests established that the two shell casings Figula found were fired from the recovered firearm. The bullet that pierced the bystander's automobile's passenger window was also found to have been fired from the same firearm.

Stafford was arrested at the scene, handcuffed, placed in the back of a police cruiser, and taken to the Elyria Police Department. At the precinct, Stafford's hands were swabbed for the presence of gunshot residue. Subsequent laboratory testing determined the presence of the elements of gunshot residue on Stafford's left hand.

By indictment filed on Febraury 2, 2011, Stafford was charged with violating 18 U.S.C. § 922(g)(1), felon in possession of a firearm and six rounds of ammunition. At arraignment, Stafford entered a plea of "not guilty."

Before trial, Stafford filed a motion *in limine* to exclude the results of the gunshot-residue analysis and testimony relating to the analysis, pursuant to Federal Rules of Evidence 702 and 403. Stafford also requested a *Daubert* hearing on the matter. This motion was denied at the final pre-trial conference of August 11, 2011. On

August 10, 2011, the Government filed a motion *in limine* to exclude the testimony of defense expert Robert Cilwa. This motion was held in abeyance at the final pre-trial conference.

Before trial began, the district court heard testimony and argument on the Government's motion *in limine*. The district court initially stated that both parties would be prohibited from admitting any gunshot-residue evidence, conditioned on the defense refraining from attempting to impeach Officer Figula's testimony at trial. Because defense counsel stated that he would attempt to impeach Figula's eyewitness testimony, and because the Government stated it would have its expert testify, the district court concluded that both the Government's and Stafford's gunshot-residue experts would be allowed to testify.

Stafford's jury trial began on August 22, 2011, and concluded on August 24, 2011. At trial, Figula testified for the Government regarding the events of November 21, 2010, and positively identified Stafford as the shooter. Officer Richard Buckway recounted Stafford's struggle with the officers and the collection of the firearm and spent shells. Sergeant Richard Ellis testified regarding his role in the investigation, namely performing the gunshot-residue test and collecting the gunshot-residue samples from Stafford's hands. The Government also introduced testimony from Martin Lewis, an expert on gunshot residue. Lewis explained the process of a gunshot-residue test, how the analysis of Stafford's test was conducted, and the conclusions he drew from the test. Joshua Barr, a forensic scientist in the firearms section of the Ohio Bureau of Investigation, testified regarding the ballistics findings and matching the spent shells to the recovered firearm. Thomas Hopkins, Special Agent for the Bureau of Alcohol, Tobacco, and Firearms, testified regarding the recovered firearm's nexus with interstate commerce. At the close of the Government's case, Stafford moved for acquittal pursuant to Federal Rule of Criminal Procedure 29, which the district court denied.

The defense introduced testimony from Stephen Gambetta, an investigator with the Federal Defenders' Office, relating to the distances from which Officer Figula testified he had seen Stafford during the shooting and the subsequent pursuit. Bruce

Freeman, the bystander whose passenger window was shattered during the shooting, also testified for the defense regarding the timing of the gunshots and when he first saw a police car on the scene. The defense did not call its gunshot-residue expert, Robert Cilwa. At the close of the defense's case, Stafford again moved for acquittal, which the district court again denied.

The jury convicted Stafford of violating 18 U.S.C. § 922(g)(1), felon in possession of a firearm and ammunition.

On September 20, 2011, Stafford filed a Motion for New Trial pursuant to Federal Rule of Criminal Procedure 33, arguing that the district court erred in admitting the gunshot-residue evidence and the related expert testimony. The district court denied the motion on October 19, 2011.

The Presentence Investigation Report ("PSR"), filed on January 4, 2012, recommended a base offense level of 24 for Stafford's violation of 18 U.S.C. § 924(g)(1), as he had at least two prior felony convictions for crimes of violence; a two-level enhancement under United States Sentencing Guideline ("Guideline") § 2K2.1(b)(4)(A) for a stolen firearm; a four-level enhancement under Guideline § 2K2.1(b)(6) for possession of a firearm in relation to a felony offense; and a two-level enhancement under Guideline § 3C1.2 for reckless endangerment during flight from law enforcement. With a calculated offense level of 32, the PSR recommended a two-level enhancement for Stafford's four prior convictions for crimes of violence, which qualified Stafford as an "armed career criminal" under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e) and Guideline § 4B1.4. According to the PSR, Stafford's recommended offense level was 34, with a recommended sentence of 262 to 327 months.

Stafford was sentenced on February 13, 2012. At the sentencing hearing, Stafford objected to the Government's calculated advisory Guidelines range, specifically objecting to the four-level enhancement under Guideline § 2K2.1(b)(6)(B) for possession of a firearm in relation to a felony offense, and the two-level enhancement under

Guideline § 3C1.2 for reckless endangerment during flight from law enforcement.[2] The district court overruled both objections and applied the enhancements.

Stafford also objected to the enhancement under the ACCA, arguing that two of his prior Ohio felony convictions for "aggravated riot" did not qualify as "violent offenses." Stafford argued that it was improper for the district court to rely on documents other than the criminal indictment or judgment, specifically the state-court Bill of Particulars that accompanied the "aggravated-riot" convictions, to determine whether the felony was a "violent offense." The district court disagreed and found that Stafford was an armed career criminal and applied the enhancements, adopting the guideline-range sentence of 262 to 327 months. Stafford received a sentence of 262 months of imprisonment and five years of supervised release.

Stafford timely appealed.

## II. ANALYSIS

Stafford raises two challenges to his conviction: (1) the evidence did not support the jury's verdict; and (2) the district court erred in admitting gunshot-residue evidence and related expert testimony.

Stafford raises three challenges to the sentencing proceedings in the district court: (1) the district court improperly applied the enhancements of the ACCA; (2) the district court announced a procedurally unreasonable sentence; and (3) the "residual clause" of the ACCA is unconstitutionally vague.

### A.     Stafford's Challenges to the Conviction

#### 1.     Sufficiency of the Evidence

The court reviews de novo a district court's denial of a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29, but that decision will be affirmed "if

---

[2]Stafford's counsel referred to the two-level enhancement under Guideline § 3C1.2 as "obstruction of justice." The title of the guideline is "Reckless Endangerment During Fight." U.S.S.G. § 3C1.2.

the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt." *United States v. Ramirez*, 635 F.3d 249, 255 (6th Cir. 2011) (quoting *United States v. Solorio*, 337 F.3d 580, 588 (6th Cir. 2003)) (internal quotation marks omitted); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A court will reverse a judgment due to insufficient evidence "only if [the] judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005) (alteration in original) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)) (internal quotation marks omitted).

To convict a defendant of violating 18 U.S.C. § 922(g)(1), a jury must find that the defendant "had a previous felony conviction, that the defendant knowingly possessed the firearm specified in the indictment, and that the firearm traveled in or affected interstate commerce." *United States v. Morrison*, 594 F.3d 543, 544 (6th Cir. 2010) (quoting *United States v. Grubbs*, 506 F.3d 434, 439 (6th Cir. 2007)) (internal quotation marks omitted). Stafford challenges only the sufficiency of the evidence supporting the conclusion that he possessed the firearm.

Stafford argues that the evidence is insufficient because the Government's case hinges on one eyewitness, Officer Figula, whose testimony was "inconsistent." Stafford cites six specific instances of Figula's inconsistencies: (1) Figula initially testified that he saw the shooter "at the bottom of the hill" on Kerstetter Way, which measured between 193 and 223 feet away, but then subsequently testified that the shooter was "further up from the bottom of the hill" and only "170 feet" away; (2) Figula testified that he saw the shooter as the last two shots were fired, yet Figula failed to give any description of the shooter when he made the first "shots fired" call and did not give a description of Stafford until Stafford had emerged from the Tremont Street alley into the McDonald's parking lot and was running past Figula's car; (3) Figula initially stated in his report that he saw Stafford shooting "directly east" towards Uncle Vic's nightclub, but at trial he testified that Stafford was aiming "in a southeasterly direction towards the corner of Kerstetter [Way] and Broad Street"; (4) Figula testified that, when he heard the

shots, his police cruiser was "at the top of the hill" on Broad Street approaching the intersection of Kerstetter Way and that he had "a clear view down the sidewalk on what would be the west side of Kerstetter Way," but defense witness Bruce Freeman testified that after he left the area of Uncle Vic's and traveled toward the intersection of Broad Street and Kerstetter Way, he did not see a police car in the area when he heard the gunshots and his window was struck by a bullet; (5) Figula admitted that he stated in his report that Kerstetter Way was "choked with pedestrians and vehicle traffic" such that he was "prevent[ed] . . . from driving the marked patrol vehicle towards Stafford," yet he testified that he had a clear view of the shooter and there was "no one" obstructing his view; and (6) Figula testified that he lost sight of the suspected shooter for approximately thirty seconds between the time the suspect ran from the scene of the shooting and when he emerged from the alley into the McDonald's parking lot.

Reviewing the evidence in the light most favorable to the Government, a reasonable jury could find Stafford guilty beyond a reasonable doubt. The court "neither independently weighs the evidence, nor judges the credibility of witnesses who testified at trial." *Ramirez*, 635 F.3d at 255 (quoting *United States v. Talley*, 164 F.3d 989, 996 (6th Cir.1999)) (internal quotation marks omitted). The appellate court "cannot substitute its judgment for that of the jury." *Id.* at 255–56.

Stafford's arguments regarding the inconsistencies in Figula's testimony go primarily to the credibility of the Government's witness. While the jury heard the inconsistencies in Figula's testimony, it also heard substantial direct evidence on which it could rely to convict Stafford. Figula testified that he "had a clear view of the shooter." Figula described the shooter's clothing:

> The shooter was wearing a black like zipup sweat shirt that had black and white stiped [sic] collar that would zip up [and] kind of cover the neck area. As the shooter turned, I was able to see cursive writing, a white print covering the entire back of the sweat shirt and I believe jean-style pants.

Figula described seeing the muzzle flashes that accompanied the final two gunshots. Figula stated he had "observed the shooter turn and run north from where he had been

standing," and that he "observed the shooter run down, turn and run—[into] an alleyway here known as Tremont Street—turn down that alleyway and continue[] running away from me." Figula described seeing Stafford emerge from the alleyway:

> I observed the same person that was shooting the weapon off here emerge out of the alleyway this way, running westbound, running from the exit or entrance of the alleyway. . . . I observed the same person as far as the same clothing and same appearance as I saw the person shooting the weapon. . . . He looked right at me . . . .

Figula also testified about finding the firearm and the spent shells. Having heard both the eyewitness testimony and its inconsistencies, the jury could have found Figula credible.

As for Stafford's argument that Figula's identification is questionable because he did not describe Stafford as the shooter over the radio until after he saw Stafford emerge from the alley, Figula explained that the reason he did not describe Stafford in the first instance was that his "main concern . . . was getting officers heading in [his] direction." He continued, "The reason I didn't give the description until a few seconds later is because I just didn't have the opportunity in between turning around, entering the parking lot, and then all of a sudden [Stafford showing up] in front of me." The jury presumably considered both the defense's argument and Figula's explanation in its deliberations. It is not unreasonable for a rational juror to credit Figula's explanation.

The jury was also presented photographic evidence of Stafford wearing the jacket Figula identified. Figula testified that the Government's photograph depicted Stafford as he was taken into custody near First Merit Bank, and that Stafford was wearing "the same jacket that [Figula] had seen the shooter wearing." Figula described the jacket in the photograph for the jury: "It is a black and colored sweatshirt style zipup and has the white writing across the back with the cursive that was able to stick out in my mind as [Stafford] turned to flee away from me on foot."

Stafford also questions Figula's seemingly inconsistent testimony that Kerstetter Way was both "choked with pedestrians and vehicle traffic" and yet he had a clear view

of the shooter firing his weapon.  Review of the testimony indicates, however, that Figula stated that while pedestrians were fleeing the scene and running up the hill, there were no pedestrians on the same side of the street as Stafford at the time of the shooting. Figula stated that "there was nobody other than the one person that I observed shooting the gun . . . on this side of the road. . . . I had a clear view of the shooter."  A rational juror could find Figula's testimony on this issue credible.

As for Freeman's testimony that he did not see any police cars at the intersection of Kerstetter Way and Broad Street at the time of the shooting, Freeman also stated on direct examination that he "was not paying enough attention with everything going on outside the car to really notice a police cruiser."  The jury heard sufficient testimony to assess Freeman's credibility in relation to Figula's version of the events.  Moreover, the jury could reconcile the testimony of Freeman and Figula.

Regarding the circumstantial evidence of Stafford's guilt, "[c]ircumstantial evidence alone can sustain a guilty verdict and . . . [such] evidence need not remove every reasonable hypothesis except that of guilt." *Ramirez*, 635 F.3d at 256 (alterations in original) (quoting *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984)) (internal quotation marks omitted).  "Actual or constructive possession is sufficient to give rise to criminal liability under § 922(g).  Both actual and constructive possession may be proved by circumstantial evidence." *United States v. Castano*, 543 F.3d 826, 837 (6th Cir. 2008) (quoting *United States v. DeJohn*, 368 F.3d 533, 545 (6th Cir. 2004)) (internal quotation marks omitted).

The jury heard testimony linking the shell casings and bullet recovered at the scene to the firearm found in the Tremont Street alley.  Joshua Barr testified as a ballistics expert for the Government.  Barr compared the shell casings found at the scene with shell casings he test-fired from the recovered firearm.  Barr concluded that "[m]icroscopic comparisons" of the recovered shell casings with the test-fired shell casings revealed that the recovered shell casings had been fired from the recovered firearm.  Barr also compared a bullet recovered at the scene with a test-fired bullet and testified that the recovered bullet had "matching individual detail with the test-fired

bullets." Barr concluded that the bullet recovered at the scene was fired from the recovered firearm.

The jury heard testimony that the shooter was wearing a black zip-up sweatshirt with white writing, that the shooter ran down the Tremont Street alley after seeing Figula's police car, that Stafford was wearing the same clothing when he emerged from the alleyway and ran past Figula's car, that Stafford continued running and hid behind the back of the First Merit Bank building, that Stafford wedged himself between the building and an electrical power box, that Stafford refused to surrender or show his hands to police when he was found, that Stafford continued to struggle with police as they arrested him, and that a scuffed firearm with a partially ejected magazine was found in the Tremont Street alley that matched the spent shells found near the scene of the shooting. The jury could therefore rationally infer that Stafford threw the gun into the alley as he was running from police. Additionally, Stafford's actions raise an inference of guilt: he continued to run from police and refused to cooperate when asked to show his hands and to come out of hiding. Although circumstantial, the evidence is sufficient for a juror to infer that Stafford was the shooter.

Viewing the evidence in the light most favorable to the Government, a rational trier of fact could find Stafford guilty beyond a reasonable doubt. Therefore, Stafford's conviction is affirmed.

### 2.    Gunshot-Residue Evidence and Expert Testimony

The court reviews a district court's evidentiary rulings under an abuse-of-discretion standard. *United States v. Ashraf*, 628 F.3d 813, 826 (6th Cir. 2011). "District courts have broad latitude in deciding whether to admit expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993). Such decisions are similarly reviewed under the abuse-of-discretion standard." *Id.* (citations omitted).

Stafford argues that the district court abused its discretion in admitting the gunshot-residue evidence and the related expert testimony because they both fail to meet the standards of *Daubert* and Federal Rule of Evidence 702. Stafford made similar

arguments before trial as to the admissibility of the gunshot-residue evidence and the experts' testimony, but the district court concluded that both were admissible because Stafford's "arguments [went] to the weight, not the admissibility," of the evidence and testimony.

Stafford makes four arguments regarding the inadmissibility of the gunshot-residue evidence. First, Stafford states that "[gunshot-residue] testing will not determine whether an individual fired a gun, was present when a gun was fired by someone else, or was merely in an environment in which [gunshot residue] existed." Stafford claims that because these three possible outcomes summarize the testimony of the Government's expert Robert Lewis—and because Lewis could not testify whether Stafford actually fired the weapon—Lewis "could not reasonably make any conclusions as to the actual source of the six [gunshot-residue] particles found," and therefore Lewis's testimony did not meet the standards of *Daubert* or Rule 702.

Under Rule 702, an expert may offer scientific or technical testimony if the court finds the witness is qualified by "'knowledge, skill, experience, training, or education'"; that the testimony is relevant; and that the testimony is reliable. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008) (quoting Fed. R. Evid. 702). Stafford, in claiming that the expert's conclusion is inadmissible, is challenging the expert's reliability, not his qualifications or the testimony's relevance. To determine the testimony's reliability, the court does not "determine whether [the opinion] is correct, but rather [determines] whether it rests upon a reliable foundation." *Id.* at 529–30. As gatekeeper, the trial court only determines the admissibility of expert evidence; the jury determines its weight. The court's focus is "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

The district court was clear when it admitted the expert testimony relating to the gunshot residue test: "Whether the jury will put any weight on either [expert], I don't know, but [the Defendant's] arguments go to the weight [of the evidence], not the admissibility." The district court stated that allowing the expert to testify would allow vigorous cross-examination of the expert's "vague conclusions" and the jury would then

decide.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination . . . [is a] traditional and appropriate means of attacking shaky but admissible evidence.").  In revisiting the issue on the second day of trial, the district court stated:

> I am allowing the government to put [the expert's testimony] in.  But given that your own expert is going to say it is possible that he has got those two traces either because he was right near a shooter, [was] a shooter of a gun[,] or that he came into contact with residue, I am permitting the defense to point that out.  The two go together.

Therefore, the district court did not abuse its discretion in admitting the expert testimony of Robert Lewis relating to the results of the gunshot-residue test.

Second, Stafford argues that gunshot-residue testing is imprecise in that "[t]here is no consensus in the discipline as to how many particles . . . must be identified in order to report an item of evidence as positive for [gunshot residue]."  Despite this argument, the trial record indicates that Stafford did not object to the district court's statement that "the Defendant is not disputing he had gunshot residue on his hands."  Additionally, Stafford relies on a Summary of the FBI Laboratory's Gunshot Residue Symposium report in both his Brief and his motion *in limine* filed August 8, 2011.  The Summary states that "[m]ost experts felt that even one particle is enough for a 'positive' result."  As the Supreme Court noted in *Daubert*, "[w]idespread acceptance can be an important factor in ruling particular evidence admissible."  *Daubert*, 509 U.S. at 594.  At trial, the Government's expert testified that Stafford's gunshot-residue test revealed five qualifying particles present on Stafford's left hand.  The results of the test indicate that the conclusion that Stafford had gunshot residue on his hand was reliable.  The district court did not abuse its discretion in admitting the results of the gunshot-residue test.

Third, Stafford claims that the possibility of inadvertent transfer of gunshot-residue particles to a suspect's hands creates prejudice that outweighs the test's probative value.  Stafford's argument goes to the admissibility of circumstantial evidence, not the admissibility of scientifically reliable evidence.  The district court found, correctly, the gunshot-residue evidence to be sufficiently reliable and allowed its

admission.  The admission of such circumstantial evidence need not "remove every hypothesis but guilt."  *United States v. Ingrao*, 844 F.2d 314, 315 (6th Cir. 1988).

As to its probative value, which is discussed further *infra*, the evidence allowed the jury to infer that Stafford was in possession of the firearm and to decide how much weight to give that conclusion.  The trial record also indicates that the defense cross-examined the Government's expert extensively on this very point—that there can be inadvertent transfer of gunshot residue resulting in "contamination."

Finally, Stafford argues that the gunshot residue is inadmissible because it is undisputed that the Elyria Police Department "fail[ed] to use proper evidence gathering techniques in testing for [gunshot residue]."  The trial record indicates that the officers, in conducting Stafford's arrest:  did not bag his hands; could have transferred gunshot residue to Stafford's hands from handling their own weapons, from the backseat of the police car, or from the booking area of the Elyria Police Department; and did not swab Stafford's hands until after he had been booked.  These arguments, while potentially valid as to the accuracy of the test and the conclusions to be drawn from it, do not relate to the test's reliability or the reliability of the expert testimony.  Furthermore, Stafford's arguments go to the weight of the gunshot-residue evidence, not its admissibility, which was properly considered by the jury.  Again, the cross-examination of the expert at trial allowed the jury to consider the weight of the gunshot-residue evidence and any shortcomings in evidence collection by the Elyria Police Department.  Therefore, the district court did not abuse its discretion in admitting the evidence.

Stafford also argues that the gunshot-residue evidence was improperly admitted under Federal Rule of Evidence 403, as its "probative value was substantially outweighed by a danger of unfair prejudice."  *See* Fed. R. Evid. 403.  "Because of the highly discretionary nature of this balancing process, the district court's decision is afforded great deference."  *United States v. Bell*, 516 F.3d 432, 445 (6th Cir. 2008).  "In reviewing the district court's balancing of prejudice and probative value, we look at the evidence in the light most favorable to its proponent, maximizing its probative value and

minimizing its prejudicial effect." *Id.* (citation omitted) (internal quotation marks omitted).

Stafford contends that because a positive finding of gunshot residue on a defendant could only reveal (1) that the individual "discharged a firearm," (2) that the individual "was in close proximity to a firearm when it was discharged," or (3) that the individual "came into contact or handled something that had gunshot residue on it," its probative value was "questionable" because it offered "two non-incriminating possibilities and one incriminating possibility." Stafford did not attempt to impeach the conclusion that gunshot residue was found on his hands, and defense counsel thoroughly explored the weaknesses in the gunshot-residue testing on cross-examination.

Regarding the issue of whether the evidence was probative, the district court stated that if the gunshot-residue evidence was being used to corroborate Figula's eyewitness account, "it becomes relevant because it bolsters the credibility of [the Government's] witness." Viewing the admitted evidence in the light most favorable to the Government, the gunshot-residue test corroborates Figula's testimony that Stafford was the shooter outside Uncle Vic's nightclub and was not unfairly prejudicial under Rule 403. The district court did not abuse its discretion in admitting the evidence.

The district court's admission of the gunshot-residue evidence and accompanying expert testimony is, therefore, affirmed.

### B. Stafford's Challenges to the Sentencing

### 1. Application of the Armed Career Criminal Act

A district court's interpretation and application of the ACCA is a question of law, reviewed de novo. *United States v. Graves*, 60 F.3d 1183, 1185 (6th Cir. 1995). Whether a prior conviction qualifies as a "violent felony" under the ACCA is also a question of law the court reviews de novo. *United States v. Johnson*, 675 F.3d 1013, 1016 (6th Cir. 2012).

The ACCA provides a mandatory minimum fifteen-year term of imprisonment for offenders convicted of violating 18 U.S.C. § 922(g)(1), felon in possession of a firearm, after having sustained three qualifying prior convictions of either crimes of violence or serious drug offenses. 18 U.S.C. § 924(e)(1). Section 924(e) defines "violent felony" as

> any crime punishable by imprisonment for a term exceeding one year . . . that (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . . .

18 U.S.C. § 924(e)(2)(B).

The district court found that Stafford qualified as an armed career criminal based on four prior predicate offenses, including two convictions for "aggravated riot," in violation of Ohio Revised Code Section 2917.02(A)(2). The district court found Stafford had an adjusted offense level of 32, criminal history category VI, resulting in an advisory Guidelines range of 210 to 262 months of imprisonment. With the ACCA enhancement, the district court found Stafford had a total offense level of 34, criminal history category VI, resulting in an advisory Guidelines Range of 262 to 327 months of imprisonment.

Stafford argues that his "aggravated-riot" convictions do not qualify as "violent offenses." As the parties do not contend that the "aggravated-riot" conviction falls under the first two types of "violent felonies" in § 924(e), it falls under the statute's "residual clause": a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii).

"[I]n determining the nature of a defendant's prior conviction, we apply a 'categorical' approach, meaning that we look at the statutory definition of the crime of conviction, not the facts underlying that conviction, to determine the nature of the crime." *United States v. Ford*, 560 F.3d 420, 421–22 (6th Cir. 2009); *see also Taylor v. United States*, 495 U.S. 575, 602 (1990). If the court finds that the statutory language

fails to clarify whether the underlying conviction is a crime of violence, or if "it is possible to violate a criminal law in a way that amounts to a crime of violence and in a way that does not," *Ford*, 560 F.3d at 422, the court may consider "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented" to determine if the underlying conviction was a crime of violence. *Shepard v. United States*, 544 U.S. 13, 16 (2005); *see also United States v. Jones*, 673 F.3d 497, 504 n.2 (6th Cir. 2012) (calling this analysis the "modified categorical approach").

> At Stafford's sentencing, the district court found that
>
> under the categorical approach or even modified categorical approach, both of [the "aggravated-riot" convictions] qualify as predicate offenses of violence, and I further find that with respect to [Stafford's 2005 "aggravated-riot" conviction], that the Bill of Particulars, which was filed about three months before [Stafford's] guilty plea, makes clear that this was a crime of violence . . . . [T]here's no question in the Court's mind that this aggravated riot was a crime of violence.

Stafford argues that the district court erred in applying the modified categorical approach and finding that his convictions under Ohio's "aggravated riot" statute were violent felonies because it relied on both the PSR and the Bill of Particulars that accompanied his 2005 "aggravated-riot" conviction, both of which are impermissible documents under *Shepard*. The Government agrees that the district court erred in considering these documents. The Government argues, however, that we should find that Stafford's "aggravated-riot" convictions are violent felonies based on the permissible *Shepard* documents in the record.

This court previously considered, in an unpublished opinion, the question of whether Ohio's "aggravated riot" offense qualifies as a "violent felony" under the ACCA. *United States v. Sanders*, 301 F. App'x 503 (6th Cir. 2008) (per curiam). In *Sanders*, a panel of this court determined that "aggravated riot" under the Ohio statute included both violent and non-violent offenses. The statute provides, in relevant part:

> (A) No person shall participate with four or more others in a course of disorderly conduct in violation of [Ohio's Disorderly Conduct statute]:
> (1) With purpose to commit or facilitate the commission of a felony;
> (2) With purpose to commit or facilitate the commission of any offense of violence;
> (3) When the offender or any participant to the knowledge of the offender has on or about the offender's or participant's person or under the offender's or participant's control, uses, or intends to use a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code.

Ohio Rev. Code Ann. § 2917.02(A). *Sanders* held that violation of subsection (A)(1) was not an offense of violence, as it "lack[ed] as an element the use of force." *Sanders*, 301 F. App'x at 506. *Sanders* then discussed the offenses in subsections (A)(2) and (A)(3) of the statute:

> Here, subsections (A)(2) and (3) of the aggravated riot statute prohibit conduct that poses risk of physical injury through "offense[s] of violence" or use of "a deadly weapon or dangerous ordnance." As a categorical matter, conduct under those subsections would obviously qualify as a crime of violence. However, as previously discussed, it is equally obvious that conduct under subsection (A)(1), does not necessarily pose a risk of physical injury.

*Id.* (alteration in original) (footnote omitted).

Although unpublished decisions are not binding precedent on subsequent panels, "their reasoning may be 'instructive' or helpful," *Crump v. Lafler*, 657 F.3d 393, 405 (6th Cir. 2011), "especially where there are no published decisions which will serve as well," *Hood v. Keller*, 229 F. App'x 393, 398 n.5 (6th Cir. 2007) (internal quotation marks omitted). In the instant case, no other Sixth Circuit case is on point. Therefore, *Sanders* is instructive and we will follow its reasoning.

Stafford argues that *Sanders* is inapplicable to the instant case because, in that case, the panel found that Sanders violated subsection (A)(3) of the "aggravated-riot" statute, not subsection (A)(2). In fact, however, *Sanders* did not determine which subsection the defendant violated. The panel applied the modified categorical approach and reviewed Sanders's indictment, which stated that Sanders

did participate with four (4) or more others in a course of disorderly conduct in violation of Section 2917.11 of the Revise[d] Code with purpose to commit or facilitate the commission of an offense of violence [and] . . . had used or intended to use a deadly weapon or dangerous ordnance, in violation of Section 2917.02 of the Ohio Revised Code.

*Id.* at 507 & n.2 (first alteration in original). The panel found that Sanders's indictment did not "cite to a specific subsection of section 2917.02. However, the language of the indictment was identical to the statutory language, revealing that his prior conviction was undoubtedly for violation of *either* subsection (A)(2) or (A)(3) of Ohio's aggravated-riot statute, *both of which* are crimes of violence . . . ." *Sanders*, 301 F. App'x at 507 (emphasis added). Therefore, the reasoning of *Sanders* is instructive.

Following the modified categorical approach and looking beyond the statutory language of the Ohio Revised Code to the underlying *Shepard* documents, Stafford's state-court indictments specifically charged him with violating section 2917.02(A)(2). The language of Stafford's indictments tracks the statutory language and the language used in the *Sanders* indictment. Both of Stafford's plea agreements provided he agreed to plead guilty to violations of section 2917.02(A)(2). The judgment states that Stafford violated section 2917.02(A)(2). In *Sanders*, the panel analyzed nearly identical language in an indictment and concluded that whether the defendant was convicted of violating *either* subsection (A)(2) *or* (A)(3), the violation would be a "crime of violence" for sentencing purposes. *Sanders*, 301 F. App'x at 507.

Because the finding that subsection (A)(2) was categorically a violent felony under the ACCA was not essential to the holding in *Sanders*, we will now separately address that subsection.

Stafford argues that the district court erred in classifying "aggravated riot" as a "violent felony" under 18 U.S.C. § 924(e) because the offense "does not necessarily involve conduct presenting a serious potential risk of physical injury to another." Stafford cites his state-court indictments and argues that they fail to identify what "offense of violence" he was convicted of committing, and are therefore not sufficient to qualify "aggravated riot" as a "violent felony" under the ACCA. Stafford argues that

the term "offense of violence," as used in section 2917.02(A)(2), must encompass all the "offenses of violence" enumerated in Ohio Revised Code Section 2901.01(A)(9), some of which do not require the "offender's use, attempted use, or threatened use of physical force against the person of another" or "otherwise involve conduct presenting a serious potential risk of physical injury to another."  As a result, Stafford claims the "breadth of the offenses of violence the statute includes[] cannot reasonably be found to be roughly similar, in kind and degree of risk posed, to the listed enumerated crimes in the ACCA—crimes which typically involve purposeful, violent, and aggressive conduct."

The ACCA's residual clause is not a catch-all provision.  *See United States v. Benton*, 639 F.3d 723, 731 (6th Cir. 2011).  Instead, "the provision's listed examples—burglary, arson, extortion, or crimes involving the use of explosives—illustrate the kinds of crimes that fall within the statute's scope.  Their presence indicates that the statute covers only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.'"  *Begay v. United States*, 553 U.S. 137, 142 (2008) (quoting 18 U.S.C. § 924(e)(2)(B)(ii)).  The offenses encompassed by § 924(e)(2)(B)(ii) are limited "to crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves."  *Id.* at 143; *see also Johnson*, 675 F.3d at 1019–20 (finding Missouri's "third-degree felony assault" statute to be a violent felony); *United States v. Clark*, 458 F. App'x 512, 515–16 (6th Cir. 2012) (finding Kentucky's "wanton endangerment" statute to be a violent felony)*; Benton*, 639 F.3d at 732 (finding Tennessee's "solicitation to commit aggravated assault" statute to be a violent felony) .

In *Benton*, the Court stated,

> [W]hether an offense involves "violent, aggressive, and purposeful" conduct is not the only point of comparison that we may consider when determining whether an offense is similar in kind and degree to the listed examples. . . . Instead, *Begay* additionally directs us to look to whether the offense "conduct is such that it makes more likely that an offender, later possessing a gun, will use that gun deliberately to harm a victim."

*Benton*, 639 F.3d at 731–32 (citation omitted) (quoting *Begay*, 553 U.S. at 144–46). The Sixth Circuit has interpreted the Supreme Court's decision in *Begay* as creating a two-part test: for an offense to be "considered a 'violent felony' under the second prong of the ACCA," it must "'(1) pose[] a serious potential risk of physical injury to others; and (2) involve[] the same kind of purposeful, violent, and aggressive conduct as the enumerated offenses of burglary, arson, extortion, or offenses involving the use of explosives.'" *Benton*, 639 F.3d at 732 (quoting *United States v. Young*, 580 F.3d 373, 377 (6th Cir. 2009)).

Analyzing the "aggravated-riot" offense under the *Benton* test, a court first asks if the acts "posed a serious potential risk of physical injury to others." Ohio's "aggravated-riot" statute is only violated when a group of four or more people act in a disorderly manner. Although *Sanders* found that there was a non-violent way of violating subsection (A)(1) of the "aggravated-riot" statute, it recognized that "not every hypothetical offense covered by a criminal statute need be violent in order to qualify as a crime of violence." *Sanders*, 301 F. App'x at 507 (citing *James v. United States*, 550 U.S. 192, 208 (2007)); *see also Johnson*, 675 F.3d at 1019 (finding third-degree assault to be a violent felony despite the fact that the offense could potentially be committed through "guile, deception, or deliberate omission"). Also, to violate subsection (A)(2), the group must act "with purpose" to commit an offense of violence. The proper inquiry, then, is whether "engaging in a course of disorderly conduct with at least four other individuals, with the specific intent to commit the offense of violence in question," presents a risk of physical injury to others.

The statute itself contemplates a risk of physical injury to others; in order to violate the statute one must have the purpose of committing an offense of violence. By its own terms, the violation presents a risk of injury. Multiplying that by four people, there is a "serious potential risk of physical injury to others." *See Callanan v. United States*, 364 U.S. 587, 593 (1961) ("[C]ollective criminal agreement . . . presents a greater potential threat to the public than individual delicts."). The "aggravated-riot" statute requires specific intent to commit violence. Therefore, the "offenses of violence"

enumerated under section 2901.01(A)(9) that lack the adequate *mens rea* are excluded. As a result, the "aggravated-riot" statute is not over-broad as Stafford suggests.

The second inquiry under *Benton*, whether the offense "involves the same kind of purposeful, violent, and aggressive conduct as the enumerated offenses of burglary, arson, extortion, or offenses involving the use of explosives," is also answered in the affirmative. As stated above, violation of Ohio's "aggravated-riot" statute involves specific intent, just as do the offenses of burglary, arson, and extortion. There is no question, then, that "aggravated riot" involves "purposeful conduct" commensurate with the other offenses. When combined with *Begay*'s inquiry whether the "conduct is such that it makes more likely that an offender, later possessing a gun, will use that gun deliberately to harm a victim," it is logical to conclude that the acts of four or more people, engaged in a course of disorderly conduct with the purpose to commit an offense of violence present a high risk of serious injury. Add to that the possession of a gun, and that risk is even greater.

Therefore, the district court's conclusion that a violation of Ohio Revised Code Section 2917.02(A)(2) is a "violent felony" under the ACCA and that Stafford qualified as an armed career criminal as a result is affirmed.

### 2.       Reasonableness of the Sentence

This court reviews sentences for procedural reasonableness under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). A sentence will be deemed "procedurally unreasonable" when the district court sentencing the defendant "'fail[s] to calculate (or improperly calculat[es] ) the Guidelines range, treat[s] the Guidelines as mandatory, fail[s] to consider the [18 U.S.C.] § 3553(a) factors, select[s] a sentence based on clearly erroneous facts, or fail[s] to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.'" *United States v. Taylor*, 648 F.3d 417, 422 (6th Cir. 2011) (alterations in original) (quoting *Gall*, 552 U.S. at 51).

Stafford's argument that his sentence was procedurally unreasonable concerns two Guideline enhancements:  possessing a firearm in connection with another felony offense and creating a substantial risk of serious injury or death while fleeing from law enforcement.  For the reasons discussed *infra*, Part II.B.3, the district court did not abuse its discretion, and Stafford's sentence was procedurally reasonable.

### 3.     Application of the Sentencing Guidelines Enhancements

"We review *de novo* a district court's application of the Sentencing Guidelines when that application involves mixed questions of law and fact. . . . [and w]e review for clear error a district court's findings of fact in connection with sentencing."  *United States v. Hayes*, 135 F.3d 435, 437 (6th Cir. 1998) (citation omitted).  "A factual finding is clearly erroneous when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. Moon*, 513 F.3d 527, 540 (6th Cir. 2008) (internal quotation marks omitted).  "A district court's sentencing determination is reviewed 'under a deferential abuse-of-discretion standard' for reasonableness, which has both a procedural and a substantive component."  *United States v. Erpenbeck,* 532 F.3d 423, 430 (6th Cir. 2008) (quoting *Gall*, 552 U.S. at 41).

### a.     Enhancement Under Guideline § 2K2.1(b)(6)

Guideline § 2K2.1(b)(6) applies when a defendant possesses a gun "with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense."  U.S.S.G. § 2K2.1(b)(6)(B).  The Guideline's comments state that the subsection "appl[ies] if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense, respectively."  U.S.S.G. § 2K2.1 cmt. n.14(A).  The court "accord[s] due deference to the district court's determination that [§ 2K2.1(b)(6)'s] enhancement applies."  *Taylor*, 648 F.3d at 431 (quoting *United States v. Burke,* 345 F.3d 416, 426–27 (6th Cir. 2003)) (internal quotation marks omitted).  Assessing the nexus between a firearm and a felony requires a fact-specific inquiry, under which the court affords due deference to the district court's

findings.  *Id.* at 432.  The district court's factual findings are reviewed for clear error. *Id.*

Stafford argues that the district court erred in "applying the enhancement because there was no evidence presented from which to infer any intent by Stafford to commit another felony offense with the gun."  Stafford relies on *United States v. Payne*, 462 F. App'x 579, 582 (6th Cir. 2012) (per curiam), claiming that the Government was required to show that Stafford possessed the "firearm with the intent to possess or use it, at some time in the future, in connection with another felony offense."

The comments to the Guideline, however, make it clear that the enhancement applies to situations where the "firearm or ammunition facilitated . . . another felony offense."  U.S.S.G. § 2K2.1 cmt. n. 14(A).  By the plain language of the comments, it is not necessary to show that, at the time Stafford possessed the gun, he also had the intent to use it in a future felony.  The district court found that Stafford possessed the gun and that he committed another felony offense, namely, shooting into a crowd:

> [T]here was evidence that the Defendant discharged the firearm either toward a car or into a crowd.  Although he wasn't charged, I heard the evidence at the trial, and I find by a preponderance of the evidence that the Defendant possessed the firearm, and that he committed . . . another crime at the time.

Under the Guidelines, the district court's findings are not clearly erroneous and are affirmed.

### b.     Enhancement Under Guideline § 3C1.2

Guideline § 3C1.2 applies if the defendant "recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer."  U.S.S.G. § 3C1.2.  "Because the 'question of what constitutes endangerment is a mixed question of law and fact . . . [that] is highly fact-based,' we give 'significant deference to the district court.'"  *United States v. Dial*, 524 F.3d 783, 785 (6th Cir. 2008) (alteration in original) (quoting *United States v. Hazelwood*, 398 F.3d 792, 796 (6th Cir. 2005)).  In order to apply the § 3C1.2 enhancement, a court must

find that the defendant knew, or had reason to know, that he was fleeing from a law-enforcement officer. *Hayes*, 135 F.3d at 438.

Stafford argues that the Government failed to meet its burden. Stafford claims that the district court failed to make a finding that Stafford knew or had reason to know that he was fleeing from law enforcement and that the trial record does not support the district court's conclusion. Stafford also claims that the district court erred in concluding that "the act of *carrying* a loaded gun while allegedly fleeing law enforcement recklessly created a substantial risk of death or serious bodily injury to another person." (emphasis added).

Stafford's first claim, that the district court did not make a finding of fact that Stafford knowingly fled from law enforcement, is not supported by the record. At the sentencing hearing, Judge Polster stated, "I heard the trial testimony about the Defendant's fleeing law enforcement while in possession of a loaded firearm, and so I find [Stafford's objection to the enhancement is] overruled." Furthermore, the record supports that finding. At trial, the court heard testimony that: Officer Figula witnessed Stafford fire the gun; Stafford looked toward the top of the hill where Figula's car was located before he fled into the alley; Stafford emerged from the alley without a gun; Stafford saw the police car upon exiting the alley into the McDonald's parking lot and continued to run; Stafford hid himself behind the First Merit Bank building; and the police found the loaded weapon discarded in the alley that Stafford had run through. Under a preponderance-of-the-evidence standard, there is sufficient evidence to find that Stafford knew he was fleeing from law enforcement. *See United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006) ("[J]udicial fact-finding for sentencing purposes must continue as it was conducted prior to *Booker*, under a preponderance of the evidence standard."); *see also United States v. White*, 551 F.3d 381, 384–85 (6th Cir. 2008) (en banc). Therefore, the district court's findings of fact are not clearly erroneous.

As for Stafford's second argument regarding whether his actions rose to the required level of "recklessly" creating a substantial risk of death or serious bodily injury, there was testimony that Stafford threw a loaded gun against a building, close to a

crowded street and nightclub. The Guidelines themselves explain that "reckless" means "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4 cmt. n.1.

While not binding authority, *United States v. Howard*, 301 F. App'x 446 (6th Cir. 2008), is instructive. In *Howard*, the defendant disputed his enhanced sentence under § 3C1.2 claiming that simply "having" a gun did not create the substantial risk necessary under the Guideline. 301 F. App'x at 449. The court in *Howard* found that the defendant did not "merely have a gun," but instead "threw a loaded and cocked gun . . . while fleeing" and that such action created the substantial risk. *Id.* In the instant case, Stafford, too, was not simply "carrying" a gun; he was carrying a loaded gun that he then threw behind the staircase of a business.

Stafford attempts to distinguish his case from previous Sixth Circuit cases upholding a § 3C2.1 enhancement by arguing that, in his case, "there was no evidence of pedestrian traffic, or nearby schools, churches, playgrounds, or residential housing" near the discarded firearm. *See, e.g.*, *United States v. May*, 430 F. App'x 520, 525–27 (6th Cir. 2011) (upholding a § 3C2.1 enhancement where defendant discarded a loaded gun in a housing project, where children and pedestrian traffic were common); *United States v. Allen*, 51 F.3d 273 (6th Cir. 1995) (per curiam) (holding that discarding a gun in a residential neighborhood, whether loaded or unloaded, where it could easily be recovered was reckless endangerment). Stafford erroneously concludes that these examples encompass the entire spectrum of locations where one would be reckless to discard a gun. To the contrary, Stafford's acts are a "gross deviation from the standard of care that a reasonable person would exercise in such a situation." Stafford threw a loaded gun into an area in the rear of a restaurant, near where employees regularly took the restaurant's trash. Officer Figula testified that other pedestrians were running through that alley shortly after the shooting. As a result, there was a significant possibility that a bystander could have come across the loaded weapon and been hurt,

or used it to hurt someone else. These actions created a substantial risk of serious injury. Under the Guidelines, the district court's findings are not clearly erroneous and are affirmed.

### 4.    Constitutionality of the ACCA's "Residual Clause"

"We review de novo a challenge to the constitutionality of a statute." *United States v. Bowers*, 594 F.3d 522, 527 (6th Cir. 2010).

As discussed, *supra* Part II.B.1, the language "or otherwise involves conduct that presents a serious potential risk of physical injury to another" is commonly referred to as the ACCA's "residual clause." 18 U.S.C. § 924(e)(2)(B)(ii). Stafford argues that the "residual clause" is unconstitutionally vague because its prohibitions are "so indefinite an ordinary person would not know what conduct it prohibits." Stafford contends that the clause is "void for vagueness, as there is no predictable, consistent, or fair definition that can be applied to the residual clause," and that it fails to provide defendants with "any reasonable opportunity to know whether a prior conviction will qualify as a predicate offense under the ACCA."

Recently, in *United States v. Perry*, 703 F.3d 906 (6th Cir. 2013), and *United States v. Campbell*, 482 F. App'x 997 (6th Cir. 2012) (per curiam), this court determined that the "residual clause" was not unconstitutionally vague. In *Campbell*, the panel recognized that the Supreme Court has held the clause to be constitutional and that it "provides guidance that allows a person to conform his conduct to the law." *Campbell*, 482 F. App'x at 997; *see also Sykes v. United States*, 131 S. Ct. 2267, 2277 (2011) (stating the residual clause provides "an intelligible principle and provides guidance that allows a person to conform his or her conduct to the law" (internal quotation marks omitted)); *James v. United States*, 550 U.S. 192, 210 n.6 (2007) (observing that the clause "is not so indefinite as to prevent an ordinary person from understanding what conduct it prohibits"). Stafford, like the defendants in *Perry* and *Campbell*, hopes to persuade us that the dissents in the Supreme Court's ACCA caselaw favor a change to the interpretation of the clause. We are bound to follow Supreme Court precedent. Therefore, we hold that the ACCA's residual clause is not unconstitutionally vague.

## III.  CONCLUSION

For the foregoing reasons, Stafford's conviction is AFFIRMED and the district court's sentence is AFFIRMED.